UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | No. 21cr 157 (TNM) |
| : | |
| : | Sentencing October 19, 2022 |
| CHRISTIAN SECOR, : | |
| Defendant. : | |

## INTRODUCTION

Christian Secor will forever regret his decision to enter the U.S. Capitol on January 6, 2020. On May 21, 2022, he entered a guilty plea, accepted responsibility, and is remorseful for his actions. On October 19, 2021, Christian Secor will appear before this Court to be sentenced for Obstruction of an Official Proceeding Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2. Mr. Secor respectfully requests, after considering all the relevant sentencing factors, including 18 U.S.C. § 3553(a), that the Court impose a sentence of two years of supervised probation, $2000 in restitution, 75 hours of community service, and home detention in lieu of incarceration.

## RELEVANT FACTS AND BACKGROUND

On December 19, 2020, the President of the United States of America announced a "Save America" rally to protest the results of the November 2020 election.[1] The rally was set for January 6, 2021, the same date Congress was set to certify the new President. On the morning of January 6, 2021, attendees gathered at the Ellipse in anticipation of the rally's start.

---

[1] President Trump announced the rally on Twitter, tweeting, "Big protest in D.C. on January 6th . . . Be there, will be wild!" *See* Dan Barry and Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

1

Several speakers took to the stage. Representative Mo Brooks (R-Ala.) urged "American patriots" to "start taking down names and kicking ass."[2] Katrina Pierson, President Trump's spokesperson during his 2016 campaign, stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or we will go after them."[3] Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result."[4] The President's son and daughter-in-law encouraged the attendees to march on the Capitol to "stand up for this country and stand up for what's right."[5] The President's son narrated that "You have an opportunity today: You can be a hero, or you can be a zero. And the choice is yours but we are all watching.[6] The President's personal attorney also spoke, making a call for "trial by combat."[7] Finally, around noon, the President took to the stage. For an hour, he criticized the election results, imploring attendees to "fight" for him:

> We will not let them silence your voices. . . we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen. . . And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. And we're going to the Capitol, and we're going to try and give.[8]

---

[2] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.
[3] Id.
[4] Id.
[5] Id.
[6] Id.
[7] Id.
[8] *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6- speech-a-key-part-of-impeachment-trial.

After hearing the President's remarks, many of the rally attendees left from the Ellipse, and headed toward the Capitol.[9] At approximately 12:50 p.m., those same attendees breached the outer barricades of the U.S. Capitol grounds.[10] The U.S. Capitol Police officers, who had been assigned from the Capitol, called for backup from the Metropolitan Police Department (M.P.D.) and National Guard.[11] The M.P.D. arrived approximately 15 minutes later, but the National Guard did not respond for nearly four hours, during which time clashes between protestors and police intensified.[12] When the President concluded his remarks around 1:00 p.m., a second wave of protestors left the Ellipse and headed toward the Capitol. By the time they arrived, the outer barriers and fencing that had previously surrounded the Capitol grounds were largely displaced, giving them free access to join the first wave of protestors on the steps of the building.

Christian Secor entered the Capitol through a door after watching hundreds of individuals do the same. After entering, Mr. Secor aimlessly walked through the building with an America's First flag and eventually walked onto the Senate Floor. He joined the crowd without a plan and without any understanding of what was about to unfold. While it is true that a group of individuals breached the East Rotunda doors, Mr. Secor's participation was minimal, short lived, and included no violence.

Christian Secor was arrested on February 16, 2021, in the Central District of California. He made an initial appearance before Magistrate Judge John D. Early and was held without

---

[9] *See* Dmitiy Khavin, et al., *Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol*, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html; *see also* Shelly Tan, et al., *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/
[10] Id.
[11] Id.
[12] Id.

bond. On March 24, 2021, Mr. Secor made an initial appearance in U.S District Court, was released on a secured bond and ordered into the High-Intensity Supervision Program (HISP). He has remained in full compliance since the time of his release.

On November 10, 2021, Christian Secor was charged via indictment with, Obstruction of an Official Proceeding Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2; Civil Disorder Aiding and Abetting, in violation of 18 U.S.C. §§ 231(a)(3), 2; Assaulting, Resisting, or Impeding Certain Officers Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1), 2; Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2); Entering and Remaining on the Floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A); Entering and Remaining in the Gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B); Entering and Remaining in Certain Rooms in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). After months of negotiation between the parties, Mr. Secor pled guilty to one count of Obstruction of an Official Proceeding Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2. Mr. Secor took responsibility for his actions, waived his right to a jury or bench trial, and pled guilty as early as possible.

## OBJECTIONS TO THE PRE-SENTENCE REPORT

Mr. Secor and counsel reviewed the Presentence Investigation Report (PSR) and filed objections to the initial PSR. Mr. Secor objects to the application of the eight-point enhancement pursuant to USSG § 2J1.2(b)(1)(B). With respect to three-point enhancement pursuant to USSG § 2J1.2(b)(2), the government is correct that the plea agreement includes the language that the

"Congressional proceeding on January 6, 2021, constitutes the administration of justice." While counsel cannot object to the enhancement, the Court is free to exercise its discretion and reject the government's request for the enhancement pursuant to USSG § 2J1.2(b)(2).

In its sentencing memoranda, the government illuminated its position during negotiations; "Mr. Secor [could] agree that the certification amounted to the administration of justice and that his offense resulted in a substantial interference with the administration of justice or the government could have required him to plead guilty to additional charges, which would authorize a higher total sentence in the event that this Court concluded that the enhancements did not apply." Gov. Memo at 23. Mr. Secor continues to object to the application of the eight point enhancement and request that the Court reject the government's psotion.

## STATUTORY FACTORS

18 U.S.C. § 3553(a), requires a sentencing court to "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the second paragraph of the statute. In determining the appropriate sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission;

(5) any pertinent policy statement—

    (A) issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense. *See*, 18 U.S.C. § 3553(a)(1-7).

Nearly 20 years after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are no longer "the only consideration" at sentencing, *Gall v. United States*, 552 U.S. 38, 49 (2007). The Court is to impose its sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case. *Id*. The Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id*. at 47.

## ARGUMENT

### I. The Nature and Circumstances of the Offense

The events of January 6 cannot, and should not, be minimized. When protestors unlawfully assembled on the grounds of the U.S. Capitol Building, and later broke through windows and doors, individuals were injured, and the U.S. Capitol Building sustained $1.4 million in property damage. And because of the breach, the 2020 Presidential Electoral College

6

count was delayed. All of these disruptions took a toll on Americans and some lost confidence in the American political system.

However, Christian Secor was not the cause of January 6, nor was he in the classification of people that caused physical harm to the Capitol or others. He entered the building, but his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day. There are a variety of factors that led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency."[13] Additionally, the former President, the rally's organizers, and speakers, contributed to the chaos. In determining the appropriate sentence, the Court should consider these other failures, as Mr. Secor was one non-violent, non-destructive individual. The American system of justice, and specifically 18 U.S.C. § 3553(a), directs the Court to look at every defendant and every defendant's actions individually. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

On January 6, Mr. Secor, upon the urging of the POTUS, traveled to Washington, D.C., to protest the results of the 2020 presidential election. He flew to the nation's capital from Newport Beach, California. After hearing the President's speech and heeding his call for supporters to "walk down Pennsylvania Avenue," Christian Secor marched with thousands of others to the Capitol building. By the time he arrived, many of the outer barricades and bicycle racks used by officers to cordon off the Capitol grounds were displaced. Personally, Mr. Secor

---

[13] *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

met no police resistance to his continual marching toward the Capitol building's steps. By the time he arrived at the building, officers had retreated to the inside of the Capitol.

At approximately 2:26 p.m., Mr. Secor walked through a previously breached door of the Capitol and joined other protestors. When he entered, he was carrying an America's First flag. While in school, Mr. Secor was the President of UCLA's America First Bruins organization. At approximately 2:38 p.m., Mr. Secor was in a group of protestors who breached the East Rotunda Doors, guarded by the Capitol Police. Mr. Secor did not overpower the officers himself, however, the doors opened, and others entered the building. At the time that Mr. Secor was in that group, he was not aware that he could be charged with Assaulting a Police Officer when he did not touch anyone. As 22-year old college student, Mr. Secor also did not understand the legal concept of aiding and abetting or impeding an officer in the performance of his duties. However, when Mr. Secor learned of his legal liability, he promptly took responsibility for his actions. The Court should also consider that Mr. Secor's presence near those doors was minimal, short-lived and, non-violent.

When Mr. Secor went into the Senate gallery at 2:42 p.m, he sent a photograph of his hand to a friend. When he sat in the seat that had been occupied by Vice President Mike Pence, it became clear that Mr. Secor was a follower. A protestor at least 20 years Mr. Secor's senior told Mr. Secor to get up from the dais, Mr. Secor complied. Mr. Secor was not removed forcibly by an officer rather, he was persuaded by another protestor. After he was told to get out of the dais, Mr. Secor got up and left the Capitol building.

It is true that Mr. Secor used Twitter, however, this Court should not decide what sentence is appropriate for Mr. Secor based on Tweets. Additionally, the fact that Mr. Secor's cell phone was never recovered and his Twitter account deleted should not be considered in

determining the appropriate sentence in this case. Understandably the law requires the Court to consider the two levels are added for (Destruction of Evidence) pursuant to USSG §3C1.1 however, Mr. Secor has provided sufficient arguments for why a variance is warranted, and a probationary sentence is appropriate.

To be clear, Mr. Secor played no role in organizing the January 6 rally, nor did he deliver inciting and aggressive commentary to the already energized crowd.  He urged no one to "kick[] ass," "go after [politicians]" or engage in "trial by combat." Additionally, Mr. Secor did not participate in the forceful breaching of the outer barricades, nor did he participate in the breaking or smashing windows inside of the U.S. Capitol.  When admonished by others to show more respect, Mr. Secor did as he was told.  Mr. Secor's conduct that day consisted of him unlawfully assembling at the U.S. Capitol, walking through an already breached door, wandering through the building, and taking photos with an America's First flag. Mr. Secor's offense conduct, and not the offense conduct of others in and around the Capitol that day, should inform this Court's sentencing determination.

This Court should also consider that Mr. Secor attempted to secure a plea agreement that included a guilty plea to the 18 U.S.C. §§ 111(a)(1), 2 count. However, the government rejected Mr. Secor's counter offer. In Mr. Secor's case, supervised federal probation is the appropriate sentence in this case and will reasonably achieve the deterrence necessary. *See United States v. Loy*, 237 F.3d 251, 256 (3d Cir. 2001) ("a condition must involve no greater deprivation of liberty than is reasonably necessary to achieve the deterrence, public protection and/or correctional treatment for which it is imposed.") (internal citations and quotations omitted).

9

## CHRISTIAN SECOR'S HISTORY AND CHARACTERISTICS

Christian and Isabella are the only two children born of Nate and Laura Secor. Christian is the eldest child, and his parents instilled in him traditional values such as treating others with respect and giving to those in need. These teachings guided Christian throughout his childhood years and into young adulthood. As set forth in the letters, Christian is unanimously considered by family and friends to be a good person with a great personality, hardworking, and always willing to lend a hand to those in need. Prior to January 6, 2021, Christian had never been in trouble with the law.

In 2018 Christian was admitted to his dream school, UCLA, and was expected to graduate in 2022. However, because of his conduct on January 6, 2021, he was suspended, arrested, and stayed behind bars for more than thirty days. Because of Christian's poor decision-making, his life has been turned upside down. However, as soon as he was released into the HISP he began working at Newport Getaways, a family-owned vacation rental business. Christian's involvement in the January 6th protest was not pre-meditated. At the time of his trip to Washington D.C., he had become disillusioned by the hysteria about a stolen election coming from social media and news channels. Christian initially intended to attend the "Save America" rally because he thought it was a protest about the 2020 election. He never set out to assault anyone or to participate in a riot. In sum, Mr. Secor's history and characteristics support a probationary sentence.

Although Christian was 22 years old at the time of the riot – legally an adult – studies have shown that the pre-frontal cortex of the brain is not fully developed until the age of 25:

> It is well established that the brain undergoes a "rewiring" process that is not complete until approximately 25 years of age. This discovery has enhanced our basic understanding regarding adolescent brain maturation and it has provided support for behaviors experienced in late adolescence and early adulthood.

10

> Several investigators consider the age span 10–24 years as adolescence, which can be further divided into substages specific to physical, cognitive, and social– emotional development.
> Recently, investigators have studied various aspects of the maturation process of the prefrontal cortex of adolescents. The prefrontal cortex offers an individual the capacity to exercise good judgment when presented with difficult life situations.
> The prefrontal cortex, the part of the frontal lobes lying just behind the forehead, is responsible for cognitive analysis, abstract thought, and the moderation of correct behavior in social situations. The prefrontal cortex acquires information from all of the senses and orchestrates thoughts and actions in order to achieve specific goals.

The pre-frontal cortex is one of the last regions of the brain to reach maturation, which explains why some adolescents exhibit behavioral immaturity. There are several executive functions of the human prefrontal cortex that remain under construction during adolescence …. The fact that brain development is not complete until near the age of 25 years refers specifically to the development of the prefrontal cortex. Maturation of the Adolescent Brain, M. Arain et al., found at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/. *See also* Tirza A. Mullin, Eighteen Is Not A Magic Number: Why the Eighth Amendment Requires Protection for Youth Aged Eighteen to Twenty-Five, 53 U. Mich. J.L. Reform 807, 812 (2020) ("The prefrontal cortex is essential for both impulse control and decision-making in complex or high stress situations and '[t]he fact remains that young people between the ages of eighteen and twenty-five do not have fully-developed capacity to control impulses and make rational choices.'" (quoting David Pimentel, The Widening Maturity Gap: Trying and Punishing Juveniles As Adults in an Era of Extended Adolescence, 46 Tex. Tech. L. Rev. 71, 84 (2013)).

This late development of the pre-frontal cortex can explain in part, but not excuse, why Christian may have made the choices he did on January 6. His lack of maturity, along with his lack of judgment, led him to where he is today. Nevertheless, since his arrest, in this case, Christian has made amends for his actions. He has pled guilty and accepted responsibility; he

has remained in full compliance while on HISP, and he now asks for forgiveness from this Court.

## CONCLUSION

In sum, Christian Secor an otherwise law-abiding citizen made a tremendous mistake by entering the Capitol on January 6, 2021. He recognizes that his conduct constituted a serious crime and that he has to pay for that conduct. However, the sentence recommended by the government of 57 months would result in a sentence that is far greater than necessary to carry out the purposes of § 3553(a). Mr. Secor respectfully requests, after considering all the relevant sentencing factors, including 18 U.S.C. § 3553(a), that the Court impose a sentence of two years of supervised probation, $2000 in restitution, 75 hours of community service, and home detention in lieu of incarceration.

s/ Brandi Harden

Brandi Harden
Harden | Law, PLLC
Bar No. 470706
400 7th Street Suite 604
Washington, DC 20004
b@hardenlawoffices.com
(202) 621-8268