<pre>
 1                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2
    United States of America,     ) Criminal Action
 3                                ) No. 1:21-cr-00157-TNM
                      Plaintiff,  )
 4                                ) Sentencing
    vs.                           )
 5                                )
    Christian Alexander Secor,    ) Washington, D.C.
 6                                ) October 19, 2022
                      Defendant.  ) Time:  2:00 p.m.
 7  _____

 8              Transcript of Sentencing
                      Held Before
 9         The Honorable Trevor N. McFadden
             United States District Judge
10  _____

11               A P P E A R A N C E S

12  For the Government:      Kimberly L. Paschall
                            UNITED STATES ATTORNEY'S OFFICE
13                          FOR THE DISTRICT OF COLUMBIA
                            601 D Street, Northwest
14                          Washington, D.C. 20579

15  For the Defendant:      Brandi J. Harden
                            HARDEN LAW, PLLC
16                          400 7th Street, Northwest, #604
                            Washington, D.C. 20004
17
    Also Present:           Robert Walters, Probation Officer
18  _____

19  Stenographic Official Court Reporter:
                            Nancy J. Meyer
20                          Registered Diplomate Reporter
                            Certified Realtime Reporter
21                          333 Constitution Avenue, Northwest
                            Washington, D.C. 20001
22                          202-354-3118

23  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.
24

25
</pre>

                    P R O C E E D I N G S

1         THE COURTROOM DEPUTY:  This is Criminal Case 21-157,

2    United States of America v. Christian Alexander Secor.

3         From probation, Officer Robert Walters.

4         Counsel, please come forward to identify yourselves for

5    the record, starting with the government.

6         MS. PASCHALL:  Good afternoon, Your Honor.  Kimberly

7    Paschall for the United States.

8         THE COURT:  Good afternoon, Ms. Paschall.

9         MS. HARDEN:  Good afternoon, Your Honor.  Brandi

10   Harden, counsel on behalf of Mr. Christian Secor.

11        THE COURT:  Good afternoon, Ms. Harden, and good

12   afternoon, Mr. Secor.

13        All right.  We're here for the sentencing of the

14   defendant, Christian Alexander Secor, who has pled guilty to

15   one count of obstruction of an official proceeding and -- in

16   violation of 18 U.S.C. 1512(c)(2) and § 2.

17        I've received and reviewed the presentence investigation

18   report and sentencing recommendation from the probation office,

19   as well as sentencing memoranda from the government and the

20   defense.  I've also reviewed the numerous letters and photos

21   attached to the defendant's memorandum.

22        Are there any other documents or materials that I should

23   have received?  Ms. Paschall?

24        MS. PASCHALL:  Your Honor, the government did provide

1    some exhibits along with our filing.

2         THE COURT:  All right.  Thanks for mentioning that.

3    Yes, I did review the exhibits, and I appreciate you sending

4    over that file.

5         And, Ms. Harden, anything else I should have reviewed?

6         MS. HARDEN:  Nothing further on behalf of Mr. Secor.

7         And just for purposes of when we speak to the Court,

8    obviously I see there's a sign that we need to approach.  If

9    I was answering something just like that, do I need to come

10   up?

11        THE COURT:  No.  That's --

12        MS. HARDEN:  Very well.

13        THE COURT:  I think Ms. Meyer would appreciate it if

14   you hit the microphone there.

15        MS. HARDEN:  Very well.  Thank you.

16        THE COURT:  Thanks.

17        Mr. Secor, this sentencing hearing will proceed in four

18   steps, many of which may seem a bit mechanical to you, but I

19   want you to keep in mind why we are here today and the gravity

20   of the situation.  You've committed a federal crime.  Today's

21   proceeding is a serious matter, as it is about the consequences

22   that you will face because of your decision to engage in

23   criminal behavior in violation of federal law.

24        The first step of today's hearing is for me to determine

25   whether you've reviewed the presentence report and whether

1      there are any outstanding objections to it and, if so, to

2      resolve those objections.

3            The second step is to calculate your recommended

4      sentence under the sentencing guidelines.

5            The third step is to hear from the government, from your

6      attorney, and you, sir, if you wish to be heard, about

7      sentencing in this case.

8            And the final step requires the Court to fashion a just

9      and fair sentence in light of all the factors Congress set

10     forth in 18 U.S.C. 3553(a).  As part of this last step, the

11     Court will actually impose the sentence, along with the other

12     required consequences of the offense.

13           So turning to the first step, the final presentence

14     investigation report was filed on October 12th, 2022.  The

15     probation office filed its final sentencing recommendation on

16     the same day.  The government filed its memorandum in aid of

17     sentencing on the same day, and Mr. Secor filed his exhibits

18     and -- on October 13th, 2022, and his memorandum the next day.

19           Does the government have any objection to any of the

20     factual determinations set forth in the presentence report?

21                 MS. PASCHALL:  No, Your Honor.

22                 THE COURT:  And, Ms. Harden, have you and Mr. Secor

23     read and discussed the presentence report?

24                 MS. HARDEN:  We have, Your Honor.

25                 THE COURT:  Does the defendant have any objection to

1   any of the factual determinations set forth in it?

2           MS. HARDEN:  Not with respect to the facts,

3   Your Honor.

4           THE COURT:  All right.  Mr. Secor, if you can

5   approach the podium, sir.

6       Sir, are you fully satisfied with the services of your

7   attorney, Brandi Harden, in this case?

8           THE DEFENDANT:  Yes, Your Honor.

9           THE COURT:  Do you feel you've had enough time to

10  talk with her about the probation office's presentence report

11  and the papers the government filed in connection with

12  sentencing?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  All right.  You may have a seat, sir.

15      The Court will accept the facts as stated in the

16  presentence report.  The presentence report will serve as my

17  findings of fact for purposes of this sentencing.  And my

18  thanks to the probation office and Mr. Walters, in particular,

19  for his help on that.

20      The presentence report lays out the probation

21  office's calculation of the advisory guideline range that

22  applies in this case.  I'll attempt to summarize the

23  calculation as follows:  First, § SJ1.2 [sic] of the

24  *Guidelines Manual* provides that the base offense level for a

25  violation of § 1512(c)(2) of the United States Code, Title 18,

1   is 14.

2          The offense here carries with it several enhancements

3   according to the probation office.  First, Mr. Secor caused or

4   threatened physical injury to a person in order to obstruct the

5   administration of justice.  Specifically, he helped a group of

6   rioters push open doors that three Capitol police were

7   guarding.  Mr. Secor and the group trapped the officers against

8   the door, eventually overpowering them.  For this, probation

9   assesses an 8-level enhancement under § 2J1.2(b)(1)(B).

10          Second, the offense resulted in substantial interference

11   with the administration of justice, specifically the Electoral

12   College certification.  For that substantial interference,

13   probation assesses a 3-level enhancement under 2J1.2(b)(2).

14          And Mr. Secor further obstructed justice by taking steps

15   to conceal evidence of his activity on January 6th.

16   Specifically, he deleted social media accounts, and police were

17   unable to recover the cell phone he used on January 6th during

18   a search of his home.  Mr. Secor also texted a friend

19   indicating that he was deleting evidence.  For that

20   obstruction, the probation office assesses a 2-level upward

21   adjustment under C1.1.

22          Mr. Secor has also accepted responsibility for his

23   actions now, on January 6th, under 3E1.1(a).  This warrants a

24   2-point decrease in the overall offense level.  He also

25   assisted authorities in the investigation of his misconduct by

1    timely notifying them that he intended to plead guilty under

2    3E1.1(b).  That reduces -- further reduces the offense level by

3    one additional level.

4          All told, the total offense level is 24.

5          Mr. Secor has no prior criminal history and zero

6    criminal history points, placing him in Criminal History

7    Category I.

8          So based upon a total offense level of 24 and a criminal

9    history category of I, the guideline range applicable to him is

10   51 to 63 months.

11         The guideline fine range is $20,000 to $200,000.

12         I would like to hear from the government on the

13   applicability of the 8-point and 3-point enhancements.

14               MS. PASCHALL:  Thank you, Your Honor.

15         I'm not going to belabor what we have already put forth

16   in our memorandum.

17         But understanding Your Honor's ruling in the

18   *Hale-Cusanelli* case, I just wanted to make a few points with

19   respect to that.  First, I think Your Honor correctly was

20   asking both parties in *Hale-Cusanelli* about how we interpret

21   the guidelines versus statutes.  And I think Your Honor reached

22   the conclusion that we should use the same tool set.  While the

23   government believes that to be correct, we've actually cited a

24   case in our brief that shows that the terms need not be the

25   same and interpreted quite the same in a statute and sentencing

1    guidelines posture.

2         While that sounds unbelievably frustrating, I think

3    there is a good reason for that.  The purpose of those words

4    are different.  The words in the statute are what the

5    government uses to charge someone with a crime, and as we

6    litigated upfront in many of these cases, we need to put the

7    defendants on specific notice as to what charges they are

8    facing under a statute.  That's why there are so many versions

9    of so many criminal statutes.

10         The guidelines are different.  The purpose of the

11   guidelines is to create fundamental fairness across as many

12   cases as possible.  And so many guidelines apply to more than

13   one statute.  And so it does end up with a little bit of vagary

14   in the sentencing guidelines, which, again, is inherently

15   frustrating but doesn't mean that we have to apply the same

16   logic that we've used in our 1512 litigation motion to dismiss

17   to determine whether the same guideline, even the same set of

18   words, means something different here than it does in that

19   context.  So there's that.

20         As was litigated in -- in the prior sentencing, of

21   course, this provision of the guidelines, 2J1.2, actually does

22   include 1512 as one of the noted crimes that they believe could

23   be applicable here.  And so we take that to mean that in

24   promulgating these guidelines, the words "the unnecessary

25   expenditure of substantial governmental or court resources"

1    could cover a proceeding of this kind without putting into a

2    pinched, narrow reading of exactly what the administration of

3    justice is.

4           In fact, in this case, because of the large expenditure

5    of resources, both governmental and now court, you could

6    apply that enhancement in this context because of the exact

7    language that's in the comment there.  But more broadly than

8    that --

9           THE COURT:  Do you think --

10          MS. PASCHALL:  Sorry.

11          THE COURT:  So on that, the governmental or court

12   resources, I mean, in some ways that -- that use of those two

13   terms kind of suggests to me that even governmental is kind of

14   a term of art there, going to this idea, again, of a court-type

15   proceeding.  It's government.  You refer to it as the

16   government.  I don't -- wouldn't take that governmental

17   resources here to mean anything that relates to a public

18   service; right?  Otherwise, the use of court is entirely

19   redundant.

20          MS. PASCHALL:  Sure.  But I think if the sentencing

21   guidelines commission were to put 1512 in this comment and then

22   we were not to apply it to the official proceeding that

23   Your Honor, and most of the other judges in this court, has

24   found was obstructed on this day, then we render that

25   superfluous in the comment there.  Why is it there if we're not

1        going to use it in this context?

2                THE COURT:  I'm sorry.  I didn't -- help me -- I

3        missed that.

4                MS. PASCHALL:  So the comment for 2J1.2 refers to

5        1512 as one of the applicable crimes to which that enhancement

6        could apply.  If the Sentencing Commission meant for it to be

7        there but then not apply a circumstance of an official

8        proceeding as Your Honor has found, and most of your judges in

9        this courthouse found was obstructed on that day, then what is

10       it doing there?

11               THE COURT:  Well, isn't the answer they didn't think

12       about this very unusual circumstance; that the vast majority of

13       obstructive-type cases are going to involve something relating

14       to a quasi-judicial event or a judicial event and that just

15       never occurred to them that --

16               MS. PASCHALL:  Of course.

17               THE COURT:  -- this might be an issue?

18               MS. PASCHALL:  Of course.  No one expects the Spanish

19       Inquisition, as it were.

20               But Your Honor asked the government attorney who was

21       here for *Hale-Cusanelli* that exact hypo; that before I had read

22       that transcript, I was going to relay to Your Honor about the

23       ghost guns; right?  Nobody --

24               THE COURT:  She didn't know what they are, but you

25       do.  Tell me what you --

1          MS. PASCHALL:  I think she knew, but she didn't know

2     as well as I do.  And, frankly, she doesn't know it as well as

3     Mr. Walters does because Mr. Walters and I have had this

4     discussion about ghost guns and about that enhancement and

5     whether or not it applies.

6          And the government consistently argues that it does

7     apply, even though the language of the guideline does not say

8     anything to that respect because the guidelines look to

9     fundamental fairness.  We are looking to punish people

10    appropriate with the crime they committed and --

11             THE COURT:  And have you had success with that?

12             MS. PASCHALL:  Not yet, Your Honor.

13             THE COURT:  That feels like the -- that feels like

14    the issue.  Like -- I completely agree with you --

15             MS. PASCHALL:  Right.

16             THE COURT:  -- that, you know, had the commission --

17    now the commission is fully functioning.  They probably would

18    want that obliteration of the serial number enhancement to

19    apply to a ghost gun.

20             MS. PASCHALL:  Sure.

21             THE COURT:  And -- but they never thought of this,

22    and they didn't.  And -- and happily under 3553(a), for you,

23    you know, at the end of the day it probably doesn't really

24    matter, but when I have to --

25             MS. PASCHALL:  Sure.

1          THE COURT:  -- correctly calculate the guidelines

2     in -- if -- you know, not to give an advisory opinion or

3     anything, but if I had the ghost gun case, I don't know how I

4     could say that a ghost gun is like obliterated -- is an

5     obliterated serial number.  I think it is like an obliterated

6     serial number.  I don't think it is obliterated, though.

7          MS. PASCHALL:  Sure.  But I think we worry a little

8     bit about slicing too thin when we're trying to answer, like,

9     an empirical and factual question as opposed to a legal one.

10    So in that instance -- right? -- like, we're -- we're looking

11    at a factual question.  There is no serial number because it's

12    a ghost gun; right?

13         Here, I think the administration of justice and the

14    Chief Judge's *Rubenacker* order kind of harps on this a little

15    bit; that it does have similar trappings of the administration

16    of justice.  We're not talking about a wholly different entity.

17    We're not talking about a ghost gun.  We're talking about an

18    official proceeding, and it has the trappings of the types of

19    proceedings that the other crimes that are listed in 2J1.2

20    have.

21         We have an official body.  They're listening to

22    objections.  They are resolving issues.  They're coming to a

23    final decision.  And so in that way, it is not so great of a

24    leave as the ghost gun to an obliterated serial number is.

25         Your Honor is correct.  You can use 3553 to adjust

1    accordingly with the facts that you're given and very

2    appropriately, but I think the government continues to ask for

3    this because of the importance of the fact that the defendants

4    for whom we are asking for these very large enhancements have

5    committed a crime that we believe is what the sentencing

6    guidelines commission had in mind.  It's just that, again,

7    nobody expects something of this nature to happen.

8         But it's not as if they didn't expect some sort

9    of conduct similar to what happened that day to be punished

10   appropriately, and I think that's the fundamental difference.

11        THE COURT:  On that point, is your argument that the

12   defendant was -- the pushing of the doors, does that trigger

13   the 8-level enhancement?

14        MS. PASCHALL:  Yes, that's the act that we're talking

15   about.  And I've provided the videos to Your Honor with respect

16   to those three officers who were trapped there in that -- in

17   that instance.

18        We've also listed in our sentencing memorandum the wide

19   variety of conduct that has garnered that enhancement in other

20   cases.  Everything from, you know, Jacob Chansley leaving a

21   threatening note to the Vice President of the United States to

22   Gregory Rubenacker throwing a water bottle at police.

23        All of those have been encompassed in this courthouse

24   thus far as either a threat to or an act towards injuring or

25   property damage or injury to another individual.

1          THE COURT:  And I take it you don't have any evidence

2     that the officers were injured; correct?

3          MS. PASCHALL:  Correct.

4          THE COURT:  And so would you be relying on the --

5     this was, I guess, not a verbal threat as in the -- that note

6     to the Vice President, but a -- some sort of potential for

7     harm?

8          MS. PASCHALL:  An act that would threaten bodily

9     injury; correct.  By taking those actions, you've now

10    threatened potential bodily injury to those people, whether

11    that is a completed injury or not.

12         THE COURT:  Okay.

13         MS. PASCHALL:  Would Your Honor like to hear anything

14    else?

15         Obviously, the administration of justice applies to both

16    of those enhancements; so our arguments are -- are equally

17    stated for both.  With respect to the -- the factual basis, I

18    believe Your Honor has reviewed the videos and -- and

19    understands what we're arguing there.  So unless you have

20    anything else, I don't think we have any other

21    guidelines-related arguments at this point.

22         THE COURT:  Okay.  Thank you.

23         Ms. Harden, you've bargained yourself out of arguing on

24    the administration of justice point.

25         MS. HARDEN:  It appears that's correct.

1          THE COURT:  I will hear you on the -- this last

2     conversation about the threat.

3          MS. HARDEN:  Yes.  Thank you, Your Honor.

4          So in its first form, I want the Court to know that I

5     asked the government -- and the government comes before you and

6     asks you to apply this enhancement based on this conduct

7     they're saying was a breach of the door.  And as the Court used

8     the word bargain, I spent months trying to work this case out

9     and resolve it in a particular fashion.

10         I actually asked the government rather than to have us

11    in this 1512 position, to put us in a position where we would

12    be able to take responsibility for those particular actions,

13    that particular thing.  It was an assault on a police officer

14    charge that was indicted, and the government rejected that

15    argument.

16         So it seems to fly in the face of justice to come before

17    you now and say, well, he can't take responsibility for it in

18    that way.  We're willing to dismiss that charge, the very

19    essence of the charge that's in the indictment, and then also

20    say that the guideline enhancement also applies.

21         So I've set forth the basis on which, Your Honor, it

22    does not apply, and I think that based on the information that

23    the Court has, both in the documents, as well as the objection,

24    that the Court can make a reasonable determination that in the

25    same way the Court found that the enhancement did not apply in

1    the *Hale-Cusanelli* case, that it does not apply here based

2    these on facts.

3         The Court has seen the video.  The Court has seen the

4    conduct there.  I don't believe that it fits the facts of the

5    8-point enhancement, and I think for the reasons that I set

6    forth, I would ask that the Court not impose the 8-level

7    enhancement on these facts.

8         THE COURT:  All right.  Thank you, ma'am.

9         So the government argues in its memorandum that

10   Mr. Secor has waived his ability to challenge these

11   enhancements because he agreed in his plea agreement that the

12   congressional proceeding on January 6th constitutes the

13   administration of justice.

14        Of course, I have an independent duty to determine the

15   proper guidelines calculation.  I wasn't a party to the plea

16   agreement.  As the Supreme Court reasoned in *Freeman v. United*

17   *States*, quote, In every case the judge must exercise discretion

18   to impose an appropriate sentence.  This discretion, in turn,

19   is framed by the Guidelines.  And the Guidelines must be

20   consulted in the regular course, whether the case is one in

21   which the conviction was after a trial or after a plea,

22   including a plea pursuant to an agreement that recommends a

23   particular sentence, close quote.  That's 564 U.S. 522,

24   pages 525-26 from 2011.

25        And, of course, the -- as I say, the rule, Rule 11,

1    explains that the parties' agreement does not bind me.  Rule

2    11(c)(1)(B) states, "if the defendant pleads guilty . . . the

3    plea agreement may specify that an attorney for the

4    government . . . will recommend, or" not agree -- "or agree not

5    to oppose the defendant's request, that a particular sentence

6    or sentencing range is appropriate or that a particular

7    provision of the Sentencing Guidelines, or policy statement, or

8    sentencing factor does or does not apply (such a recommendation

9    or request does not bind the court)."

10           As the attorneys know, I -- it is -- it is not terribly

11   unusual for me to disagree with the defendant -- or the parties

12   even on an agreed-upon sentencing guideline calculation.  Often

13   that ends up favoring the government at the end of the day,

14   that I will -- I will find based on the probation office's

15   investigation that there are facts that justify increasing the

16   guideline range beyond what the parties had agreed to, even --

17   even though the government is not asking for it because I have

18   an independent duty to reach the appropriate sentence and

19   appropriate guideline range.

20           Here I think is a circumstance where despite the

21   defendant bargaining away his argument on the administration of

22   justice, I have an independent duty to determine the

23   guidelines, must find that these Guideline 2J1.2(b)(1)(B) or

24   (b)(2) apply here.  And I find that they do not.

25           I'll just say in passing, I'm not going to rule on the

1    question of whether the -- Mr. Secor's conduct showed that he

2    caused or threatened to cause physical injury to any person or

3    property damage.  I don't hear the government suggesting there

4    was property damage that would justify the 8-point enhancement.

5    I think they're relying on not him causing physical injury

6    either but the potential for physical harm based on the blocked

7    door by the police officers.  I think that's a relatively close

8    call, but in any event, I don't believe the government has met

9    its burden to show the defendant obstructed or interfered with

10   the, quote, unquote, administration of justice as required for

11   these enhancements to apply.

12        As Ms. Paschall notes, I handled a very similar question

13   in *United States v. Hale-Cusanelli*, 21-cr-37, and I'm going to

14   point to and incorporate by reference my oral ruling from

15   September 22nd, 2022, there, pages 50 to 56 of my -- of the

16   sentencing colloquy.

17        In short, I think both the connotation and denotation of

18   the phrase "administration of justice" suggests a relationship

19   to the judicial system or a quasi-judicial system.  I recognize

20   this term is broad and has been used in a variety of

21   situations, including obstruction of grand jury proceedings,

22   criminal investigations, and even agency investigations.  And

23   the government points to a number of cases outside of this

24   district where that enhancement has been used in a wide variety

25   of quasi-judicial situations.

1       And I don't think I necessarily disagree with the

2   holding, anyway, in any of those cases, but I -- I think the

3   certification of the electoral vote is a political proceeding

4   involving a different branch of government with no nexus at all

5   to the judicial process.  There is no, quote, application of

6   the sanction of force to that rule of right, close quote, to

7   quote from *Black's Law Dictionary* definition of administration

8   of justice.

9       Finally, I don't think that the government's reliance on

10  the commentary to the substantial interference with the

11  administration of justice gets them where they need to be.  For

12  starters, the circuit has made clear that the commentary cannot

13  expand the definition of a guidelines term, and I'm looking for

14  that to *United States v. Winstead*, 890 F.3d 1082, pages 2092

15  from 2018.

16      Second, I think in context, the phrase the government

17  relies upon, the unnecessary expenditure of substantial

18  governmental or court resources, arguably helps the defense, as

19  governmental in this phrase likes -- likely refers to

20  prosecutorial resources.  As I mentioned to Ms. Paschall, if

21  governmental here really referred to any public agency, the

22  term court would be redundant.  In short, this phrase further

23  buttresses my impression that administration of justice relates

24  to the judicial system, not anything that impacts some branch

25  of government.

1          For all these reasons and for those more clearly laid

2      out in *Hale-Cusanelli*, I find that the proposed 8- and 3-point

3      enhancements do not apply.

4          Mr. Secor, therefore, is at Offense Level 13, I believe,

5      with a range of 12 to 18 months under the guidelines.

6          The Court will now discuss the remaining applicable

7      penalties, which include imprisonment, probation, fines, and

8      restitution.  For this count, obstruction of an official

9      proceeding, the maximum prison term the Court may impose is

10     20 years.  There's a maximum fine of $250,000.  There's also a

11     mandatory special assessment of $100.

12         For Count 1, the Court may impose a term of supervised

13     release of not more than three years.  According to

14     18 U.S.C. 3561, Mr. Secor is eligible for one to five years of

15     probation because Count 1 is a Class C felony.  And he would be

16     eligible as well under the guidelines given my revised finding

17     on the guideline range.  One of the following must be imposed

18     as a condition of probation unless extraordinary circumstances

19     exist:  a fine, restitution, or community service.  Under

20     18 U.S.C. 3663(a), restitution is mandatory in this case, and

21     the parties have agreed to $2,000 restitution.

22         Have I stated accurately the statutory framework under

23     which we are operating in regard to this case?

24         Ms. Paschall?

25              MS. PASCHALL:  Yes, Your Honor.

1          THE COURT:  All right.  And Ms. Harden?

2          MS. HARDEN:  Yes, Your Honor.

3          THE COURT:  Before I discuss the other sentencing

4   factors that will bear on the Court's final decision, I will at

5   this point share with the parties the particular sentence the

6   probation office has recommended, taking into account the

7   advisory guideline sentence, the available sentences, and all

8   the factors listed in 3553(a).  The probation office has

9   recommended a sentence of 51 months' imprisonment, 36 months'

10  supervised release, restitution in the amount of $2,000, and a

11  special assessment of $100.  The recommendation of the

12  probation office is based solely on the facts and circumstances

13  contained in the presentence report.

14      I must now consider the relevant factors that Congress

15  set out in U.S. -- 18 U.S.C. 3553(a) to ensure that the Court

16  imposes a sentence that is, quote, sufficient but not greater

17  than necessary to comply with the purposes of sentencing, close

18  quote.  These purposes include the need for the sentence

19  imposed to reflect the seriousness of the offense, to promote

20  respect for the law, and to provide just punishment for the

21  offense.  The sentence should also afford adequate deterrence

22  to criminal conduct, protect the public from future crimes of

23  the defendant, and promote rehabilitation.

24      In addition, under the guidelines and policy statements,

25  I must consider the nature and characteristics of the offense,

1    the history and characteristics of the defendant, the need for

2    the sentence imposed, the guideline ranges, the need to avoid

3    unwarranted sentence disparities among defendants with similar

4    records who have been found guilty of similar conduct, and the

5    types of sentences available.

6        Does the government wish to be heard in the application

7    of the factors set forth in 3553(a), request a variance, or

8    otherwise make a sentencing recommendation?

9        MS. PASCHALL:  Yes, Your Honor.  Thank you.

10       So the government will be asking for a variance in

11   accordance with the newly established base offense level.

12       I want to begin by saying that we are looking very

13   closely at all of these cases across all of the judges and

14   trying to fashion sentences that follow a particular rubric so

15   that it doesn't look random.  And the government's

16   recommendation of 57 months here does fall within the

17   constellation of the sentences that have been imposed thus far.

18       THE COURT:  It's pretty high -- right? -- on those?

19       MS. PASCHALL:  It -- it is high.  It's not higher

20   than what has been previously recommended.  So, for instance --

21   and I know it's -- it's high compared to what has been

22   adjudicated by --

23       THE COURT:  But I thought that's what you're just

24   staying; you're looking at what other judges are doing

25   throughout the courthouse.

1          MS. PASCHALL:  We are, but we're also looking at our

2   own internal rubric of why we're asking for what we are asking

3   for.

4          THE COURT:  Okay.

5          MS. PASCHALL:  Mr. Secor is now the 11th defendant to

6   be sentenced for a plea agreement to 1512(c)(2).  Others have

7   been sentenced at trial, which is, of course, a slightly

8   different posture, and we do take into consideration the fact

9   that he has accepted responsibility here.

10        But there are several distinguishing factors, and the

11   core that drew Your Honor's attention in the sentence

12   memorandum to the *Pruitt* case as a close comparator.  I would

13   also draw Your Honor's attention to the *Chansley* case as a

14   close comparator.  The recommendation by the government in the

15   *Jacob Chansley* case was 51 months, consistent with a similar

16   base offense level that was provided by probation here, except

17   for the fact that Mr. Chansley did not have an additional

18   2-point enhancement for any obstructive activities after the

19   fact.

20          THE COURT:  That's, like, the shaman; right?

21          MS. PASCHALL:  That's the shaman.

22          THE COURT:  Okay.  How could we forget?

23          MS. PASCHALL:  And I hope in -- in laying out our

24   factors and why we are asking for this, it seems like more of a

25   close comparator than it does, just in the -- in the mind of

1    somebody who thinks of the shaman, you know, may -- may reach a

2    somewhat different conclusion.

3        But distinguishing factors that we believe to be

4    aggravating including membership in an organization with

5    extremist ideology, involvement in what had led to our

6    recommendation of the 8-point enhancement.  So any sort of

7    physical attack, injury to property, threats to life, things of

8    that nature.

9        The defendant finding himself in sensitive areas of the

10   Capitol; here, not only is the defendant, of course, on the

11   Senate Floor, he also is in Speaker Pelosi's office suite,

12   which is highly concerning for reasons that I'll lay out.  He

13   was one of the first people to enter the floor of the Senate

14   and, ultimately, sit in the chair of the Vice President, and

15   then, of course, as we've mentioned, he deleted evidence and

16   encouraged others to do so.

17       With respect to the first, this is most likely -- I

18   think it is -- the first defendant to be sentenced who is a

19   member of the America First organization.  I think this Court

20   is now pretty well aware of the Proud Boys and the Oath Keepers

21   and even QAnon.  But America First is an organization that the

22   government is also very concerned about their extremists

23   beliefs, not only because of their adherence to an ideology

24   that is concerning, but also because their leader, specific to

25   January 6th, was encouraging the types of acts that we then

1    saw.

2          And anybody who espouses an adherence to an ideology

3    where their leader is telling them to storm every state capitol

4    until President Trump is inaugurated, for four years, brings

5    the same level of concern for the government as these other

6    organizations that we know more about.  So that elevates the

7    government's recommendation here.

8          THE COURT:  So I'm not -- it's not fair to ask the

9    prosecutors to all have your allocutions be consistent

10   throughout, but I, frankly, have been thinking about

11   Mr. Hale-Cusanelli, most notably because I had that one.  And

12   there, you know, he personally had all sorts of very disturbing

13   racist and hateful comments that I thought were very relevant

14   that, frankly, your -- your colleague, I think, did not say

15   exactly weren't relevant, but seemed very uncomfortable, you

16   know, in this -- kind of First Amendment concerns, so on and so

17   forth.

18         MS. PASCHALL:  I think the government is not in the

19   business of condemning people for their political beliefs or

20   speech, but it becomes unbelievably relevant in the context of

21   a crime like what was committed on January 6th.  So I think

22   Your Honor should be concerned.

23         The government is concerned.  We're not, again, willing

24   to condemn people for what they put on Twitter outside of the

25   context of crimes that they committed where they take those

1    extremist beliefs and put them into violent action.  That's

2    where the concern lies.  If Mr. Hale-Cusanelli or Mr. Secor had

3    just kept their comments to Twitter or to their friends or to

4    their roommates, we wouldn't be here and I wouldn't have to

5    bring it up.

6           THE COURT:  Do you know, is Bruins America First, or

7    whatever it is, is that like a college-sanctioned club?

8           MS. PASCHALL:  Yes, it's like a college

9    Republicans --

10          THE COURT:  Is that -- I guess -- I wonder if there's

11   some daylight between what you're describing to me as their

12   views and what somebody else may think their views are.  Like,

13   I can't imagine UCLA has a local chapter of the KKK or

14   something like that.

15          MS. PASCHALL:  Sure.  But I think all we have to do

16   is look to his own words and his own Twitter to understand

17   exactly what his personal beliefs were, regardless of what the

18   college-sanctioned institution is.

19          In looking to the person that he idolizes in those

20   tweets, Nick Fuentes, and understanding what he was asking

21   people to do -- there are people on trial right down the hall

22   here for following a person who was proselytizing the violent

23   overthrow of the government as well, and that is very

24   concerning.

25          The same is true here.  It's not to say, again, that

1    being a member of some college-sanctioned political group is

2    within the purview of the government to decide one way or the

3    other what it means.  It's his own words, and his actions

4    subsequent to what we see him espousing on Twitter, following

5    this leadership, that then makes it concerning.

6          Because, as Your Honor knows, we can never get inside

7    the head of a defendant and know what he was thinking when he

8    was here on January 6th, but we have his tweets.  We have his

9    understanding of what the leader of this group that he follows

10   wanted them to do.  We have his text messages, and that is

11   where the concern comes in.

12         THE COURT:  And so you're specifically looking to the

13   tweets you cited on page 34 of your --

14         MS. PASCHALL:  Correct.  Right.  What is in the

15   government's memorandum there, as well as text messages that

16   are elicited in the statement of facts with regard to the

17   planning that he told others he was doing on his way here; that

18   he felt the need to prepare potentially with a gas mask.  We

19   don't see him with that, of course, at the Capitol, but that's

20   what the text messages indicate; indicate a preparation for

21   violence, which is consistent with the ideology that we see on

22   the internet.  And it is that ideology coupled with action that

23   concerns the government.

24         We also mention quite a bit about ghost guns and -- and

25   access to firearms.  And, again, the government is not in the

1      business of condemning people for exercising their

2      Second Amendment rights.  It only becomes our purview when we

3      are concerned that it is coupled with an extremist ideology,

4      it's coupled with a call to arms to effect political

5      proceedings.  That is when that becomes problematic for the

6      government.

7            And it's another reason that we have asked for the

8      sentence that we have asked for.  Specific deterrence for this

9      defendant with that constellation of facts is really

10     concerning.  And so it's not to say that, again, independent of

11     his actions here at the Capitol, the government would care one

12     way or the other about his statements and his position around

13     firearms; it's coupled with this action.

14            THE COURT:  But it didn't -- yeah, I guess I -- I'm

15     struggling on this, Ms. Paschall, because he didn't bring --

16     apparently, anyway, on this -- on this great day of days here,

17     where if you're right, that he's gone and amassed this arsenal

18     to start a civil war and yet --

19            MS. PASCHALL:  Sure.  But look at what he says after

20     the fact.  So maybe he doesn't; right?  Maybe he knows enough

21     to know that he can't bring his guns into the District of

22     Columbia, he couldn't fly on an airplane with them.  He's not

23     going to bring mace or pepper spray.  You know, he's a smart

24     kid.  He went to UCLA.  He's chapter president of this

25     political organization.

1          What do we see after January 6th?  We see messages about

2     building guns, about being in a civil war, about taking steps

3     for ultra-secret operations.  We see an escalation, not

4     remorse.  We see concerning behavior continue until he is

5     arrested.  And since his arrest, of course, we haven't seen

6     that behavior, but we don't know what we don't know; right?

7          All of these facts are concerning enough for the

8     government to want specific deterrence for this defendant and

9     this posture.  So that's why we bring all of that up, not

10    because, you know, again, that it's our job to condemn someone

11    for their First or Second Amendment rights.  It's all of it

12    taken in the totality of the circumstances.

13         With respect to where the defendant went in the Capitol,

14    that's pretty concerning for the government.  He's both on the

15    Senate Floor, where the proceeding was supposed to be

16    happening.  He's in Speaker Pelosi's office suite.  So those

17    particularly sensitive areas are concerning.

18         Again, taken in the context of his prior statements --

19    right? -- he's talking about winning the election by illegal

20    means.  Republican governors drafting articles of succession

21    and the like.  So presence in areas where the nation's top

22    lawmakers are supposed to be when a mob descends to disrupt

23    this proceeding makes him, in the eyes of the government, more

24    culpable than those who maybe walked in, saw the Rotunda, and

25    walked out.

1        We've already discussed the east Rotunda doors incident.

2   I think it's worth focusing not only on the sort of sterile

3   CCTV video, but what was submitted in Government's Exhibit 9 is

4   another defendant Ronald Sandlin's video from that moment in

5   time, to truly understand what's going on there.  Joining in in

6   that moment is particularly concerning.  The defendant would

7   have seen the officers there, would have known with the alarms

8   blaring and everyone screaming what he was taking part in

9   there.

10       And while the defendant may not have known who was on

11  the other side of those doors, it's not a stretch to believe

12  that somebody who is on the other side of those doors are the

13  defendants who are sitting down the hall in front of

14  Judge Mehta who were there to violently overthrow the

15  government in this context.  He bears responsibility for that

16  by opening those doors.

17       Now, does he bear responsibility for everything that the

18  Oath Keepers were doing?  Of course not.  But it's not a

19  stretch for somebody who stormed the Capitol on January 6th and

20  is breaking open the door for others to come in to believe that

21  those on the other side of the doors are going to commit the

22  acts that maybe he's not going to commit himself.

23       With respect to the not allowing him to plead guilty to

24  the 111(a), Ms. Harden did zealously advocate for that.

25            THE COURT:  I'm sure she did.

1          MS. PASCHALL:  And it is not the government's

2     position that we didn't let him plead guilty to that because we

3     think he didn't do it or that it's not relevant.  It's not what

4     he was there to do on that day.  It's not the conduct in its

5     totality that he shoved open a door that was blocked by other

6     police officers.  Everything in its totality says that that

7     moment is part of a larger crime that was committed on that

8     day.  And so that is why the government was determined that

9     this was the appropriate charge for him to plead guilty to

10    because he, in that moment, is furthering his aim of stopping

11    the Electoral College.

12          With respect to the destruction of evidence prong, I

13    distinctly remember Your Honor bringing this up at our

14    detention hearing a while ago about whether concerns about

15    destruction of evidence of this type is outside of the

16    ordinary, and certainly at the detention hearing phase, maybe

17    not as probative as it is here.  But one of the things that I

18    want to highlight for Your Honor is this is different than if

19    we were in a drug trafficking context and we had somebody

20    deleting text messages, encouraging others to delete text

21    messages, deleting Twitter.

22          Here's why.  Your Honor has now seen, in this case

23    alone, videos from other people who were committing crimes on

24    that day that were used to prosecute this defendant.  You've

25    seen it in trials where we've used information gathered in one

1    investigation against others.  So doing so in this context is

2    not simply because this defendant maybe doesn't want to get in

3    trouble, like any number of defendants would be.  The

4    government no longer has the ability to get the probative

5    evidence that we could potentially use against dozens,

6    hundreds, thousands of other potential defendants in this

7    context.

8         So the destruction of evidence here is particularly

9    concerning because it makes it so that the government can't use

10   whatever evidence might have been available.

11        And then the final thing that I wanted to mention is

12   deterrence.  I've mentioned the constellation of factors as to

13   specific deterrence for this defendant.  The government hopes

14   that with a sentence of incarceration here, this defendant will

15   be deterred from any future criminal activity.  But Your Honor

16   has now heard, many times over, the deterrence concerns for the

17   January 6th cases run so much deeper than that, and Your Honor

18   is allowed to consider under 3553(a) a general deterrence

19   standard.

20        The government is consistently asking for harsh

21   sentences in these cases so that nothing like this ever happens

22   again; and that is one of the reasons, among all that are

23   stated in our sentencing memo, the government is asking for

24   47 months of incarceration, 3 years of supervised release, and

25   the $2,000 restitution to the Capitol.

1          THE COURT:  Ms. Paschall, can you tell me anything

2     about the -- there were several of these pleas that had

3     18 months.  Do you know why that was?

4          MS. PASCHALL:  If you can tell me the defendant's

5     name, I can probably tell you why.

6          THE COURT:  All right.

7          MS. PASCHALL:  Paul Allard Hodgkins was probably the

8     first one.  He was the first guilty plea in front of

9     Judge Moss.  I believe he got eight months.

10          THE COURT:  Yeah.  Michetti and Hodgkins.

11          MS. PASCHALL:  Michetti, I believe, had extenuating

12     circumstances having to do with mental health issues, I

13     believe.

14          Hodgkins was somebody -- he was actually the very first

15     felony plea in all of the January 6th cases, and he did not --

16     we didn't argue the 2J1.2 enhancement, not because of the

17     administration of justice issue but because of his actions on

18     that day.  He didn't participate in anything like this

19     defendant did.

20          THE COURT:  And the other one, Miller.

21          MS. PASCHALL:  Miller was both young in age and --

22          THE COURT:  Like how young?  Like 22?

23          MS. PASCHALL:  -- intoxicated.  I think he is the

24     same age as Mr. Secor.  And he was also intoxicated at the time

25     of the offense.  My understanding also is that in the interim

1    time, I believe he had maybe, on his own accord, gotten some

2    additional treatment or something of that nature before he came

3    forward for his sentencing.  So I believe the judge took that

4    into consideration.

5         And Michetti as well.  He had a minor child and

6    proactively was involved in rehabilitation for various mental

7    health issues in between the time of his arrest and the time of

8    his sentencing.

9         THE COURT:  Do you know what you-all recommended for

10   Miller?

11        MS. PASCHALL:  It was in the upper 50s, I believe.  I

12   believe he would have had a similar guidelines range.  He may

13   have been in the 41- to 51-month range without the obstruction.

14   So I believe it was in the 50s.  Similar.

15        THE COURT:  All right.  Thank you, ma'am.

16        Ms. Harden, do you wish to be heard in the application

17   of the factors set forth in 3553(a), request a variance, or

18   otherwise make a sentencing recommendation?

19        MS. HARDEN:  Yes, Your Honor.  Thank you.

20        So, first, I would ask the Court take into consideration

21   at this time when this incident happened, Mr. Secor was a

22   college student and was 22 years old.  And so just think about

23   his mindset, who he was, and what he had going on at that time.

24        Now, the government has pointed to a lot of Twitter, a

25   lot of tweets, that sort of -- they ask the Court to look into

1       his mind in terms of determining his intent.  First of all,

2       Your Honor, he came.  He made plans to come here on January the

3       5th, so it's not a long-standing plan to come here.  And he

4       came here to attend a rally.  Eventually, he made his way to

5       the Capitol.  There's no question about that.

6              And just like the Court said at the beginning of this

7       sentencing, he has committed a federal crime.  He has taken

8       responsibility for that crime, and he has pled guilty for his

9       actions on that day.

10             So with respect to what the government brought up to the

11      Court just recently, just here during the allocution, they say

12      to the Court that this participation in America First is

13      somehow an indication that the Court should be concerned that

14      he's dangerous in the future.  I really couldn't have said it

15      any better than what the Court said, which is:  There's an

16      America First chapter at his school so it cannot be it's just

17      some untoward organization that only stands for bad behavior.

18      And the Court should not take into consideration that Mr. Secor

19      is somehow dangerous because he was either in America First,

20      had an America First's flag, or was in this group/club that was

21      at his college.

22             The government also asks you to take into consideration

23      in imposing what is an unreasonably high sentence that he had a

24      gas mask.  So, first and foremost, Your Honor, there's no

25      evidence he actually brought the gas mask to the Capitol and so

1    he was intending to stave off some kind of attack that was

2    going to happen.  But I've had conversations with Mr. Secor,

3    and I can tell you that he was concerned about tear gas that

4    had been used in repeated protests in D.C. before.  There's no

5    situation where he was attempting to -- to take over the

6    government or engage in some kind of civil war.  That is just

7    blown out of proportion, and I would ask the Court not take

8    that into consideration in the way that the government has

9    asked you to do.

10        It defies logic that the government says to Your Honor

11   that Mr. Secor is somehow responsible for the people that are

12   on trial down the hall because, potentially, they were on the

13   other side of that door.  It just defies logic.  And what I

14   will say to Your Honor is that I did ask the government on

15   several occasions for misdemeanor charges.  Some of these cases

16   were brought in Superior Court, Your Honor.  I asked for

17   misdemeanor charges.  I asked for the assault on a police

18   officer charge because I think based on the nature of the

19   conduct, the Court could see -- or I could argue to the Court

20   his participation was minimal.  But the government stood right

21   before you and says he has no idea who was on the other side.

22   So how in the world could he be responsible for the actions

23   that the other people took once they came in?

24        I don't want to get too far into it because I think it's

25   up for this Court to make a determination whether or not that

1    conduct -- the conduct with respect to the breach of the door

2    was violent or threatening in nature.  So I don't want to go

3    too far there, but what I will say is there were 40 people

4    there, and he was at the back.  And -- and I will just let the

5    Court make a determination from that.  He certainly engaged in

6    conduct.  I don't think that he intended to hurt anybody, but

7    he certainly was caught up in the moment.

8         What I will also say is, Your Honor, I went to the

9    Capitol after this happened -- right? -- as is my job so that I

10   could figure out what all was happening.  I can tell you that

11   the building is so difficult to get around, Mr. Secor doesn't

12   know what office he was in one from the next.  Yes, he may have

13   gone into Nancy Pelosi's office, but I can guarantee you, one,

14   he didn't have any intent to specifically go there; and two,

15   when he got there, other than people talking about it, he would

16   not have had a clue that that's where he was.

17        Now, the conduct on the Senate Floor is different;

18   right?  There's no question that once you get there, you can

19   figure out that you're on the Senate Floor.  But, again, that

20   building is used for lots of things, and people attempt to

21   interrupt things that happen there all the time.

22        And what I will say, Your Honor, is this:  Mr. Secor was

23   wrong.  He certainly sat in that chair, but there was a point

24   in which both the police officer and an older gentleman asked

25   him to get up.  The police officer said:  Now that you guys

1  have these pictures, can you go?  Mr. Secor complied and left.

2  So he was there.  He did something wrong.  And once he was

3  actually asked to leave, both by, again, someone else that was

4  there and a police officer, he got up and left.

5       There is no larger crime here.  The government wants you

6  to take, again, his tweets and say that he was somehow wanting

7  to be involved in an overthrowing of the government.  Look,

8  Your Honor, people have whatever beliefs they have about

9  whether the election was right or wrong, and they're entitled

10  to those beliefs, but that does not mean that he is intending

11  to overthrow the government.  And the government really is just

12  stretching, as far as they can possibly stretch, these facts.

13       Again, some of these charges -- some of these charges

14  related to the Capitol were brought in Superior Court, and that

15  is absolute prosecutorial discretion, but the government is

16  asking you to do something that is just not appropriate in this

17  particular case.

18       THE COURT:  You mean some of these charges from

19  January 6th?

20       MS. HARDEN:  Yes, January 6th charges.  Some of them

21  were brought in Superior Court.

22       THE COURT:  I felt like I've got them all.  I didn't

23  know there were more.

24       MS. HARDEN:  There were some, Your Honor, yes.

25       And, again, the Court knows the -- the sort of

1    difference.  The government has whatever discretion they want.

2    But, I mean, again, some people were charged not in federal

3    court but in Superior Court, and that's certainly the

4    government's discretion.  But, again, here I think that the

5    government is asking you to take some of Mr. Secor's speech and

6    sort of say that he is -- he was going to be involved in some

7    overthrowing of the government, and that's just not the context

8    of what you have before you.

9            Let's talk about the deterrence here, Your Honor.

10   Mr. Secor -- he would have -- let me take a little

11   responsibility here.  He would have pled guilty earlier but I

12   kept negotiating and kept going on and on with the government,

13   which I'm sure the government will tell you.

14            THE COURT:  I can certainly imagine that.

15            MS. HARDEN:  Just -- it's really -- I mean, he would

16   have been here earlier.  So -- so what he's done, Your Honor,

17   is he has taken full responsibility, as you would expect a

18   young man to do when he finds himself in a situation where he

19   has done something wrong.  But he didn't just take

20   responsibility.  He is now a felon for life.  Okay?  So, sure,

21   everybody is a felon for life that has a felony charge before

22   Your Honor.  But, again, the 30-minute decision that he made to

23   go into -- or the one decision he -- one-minute decision he

24   made and stayed in the Capitol for 30 minutes has rendered the

25   rest of his life a felon.

1          So there's been a lot of deterrence here.  He's already

2     been punished in a substantial way.  He still has to finish

3     college.  He still has to finish his young life out, and he is

4     already going to be ten steps behind.  But it's not just that,

5     Your Honor.  I mean, he also went to jail.  He also spent time,

6     36 -- between 36 and 39 days.  I wasn't there at the very

7     beginning, so I'm not clear whether it was 36 or 39.  It

8     appears to be 39 -- in solitary confinement in jail in

9     California.  So in terms of punishment, in terms of what would

10    deter him in any future conduct, Mr. Secor has had it.

11         And I do want you to know, Your Honor, that, you know,

12    jail is jail.  But Mr. Secor, at 22, was in solitary

13    confinement.  Now, I don't know if it was because it was a

14    January 6th case, because it was an out-of-town warrant, what

15    the situation was.  But I really couldn't get access to him in

16    the very beginning until I, you know, kept pressing and kept

17    pressing, and they eventually allowed me to have video visits.

18    But he was in solitary confinement.  That's 24 hours a day and

19    not getting out of a cell.

20         So, again, the -- in terms of punishment, the Court --

21    the question the Court has to answer is whether federal prison

22    is appropriate for Mr. Secor, and I would respectfully ask the

23    Court answer that question with no.

24         With respect to these guns that the government, again,

25    wants the Court to -- to determine that Mr. Secor is somehow

1  dangerous in the future, he lives in California.  We are not

2  dealing with somebody who lives in Washington, D.C., where you

3  don't have the ability to get a gun here or carry it unless you

4  have, you know, the most stellar background ever.  He lives in

5  California where that's not an issue, and the government has

6  not said to Your Honor that --

7          THE COURT:  Really?

8          MS. HARDEN:  Yes.  Shocking.

9          THE COURT:  I would have thought California would

10  have at least as strict rules as D.C.

11          MS. HARDEN:  I'm just saying.  Not quite.

12          THE COURT:  I'm a little East Coast boy.

13          MS. HARDEN:  Not quite.

14      And what I will say, Your Honor, is that the government

15  hasn't produced anything to you that would suggest that he's

16  been violent.  You know what says whether he's violent or not?

17  His criminal history.  And you have for years watched clients

18  and watched cases with people who have -- have -- can tell

19  you -- you can look to their past to determine whether or not

20  their future conduct is going to be in line with a certain

21  thing.

22      Mr. Secor, at 24, sits before you with zero criminal

23  history, and that's what tells you that he's not violent.

24  Plus, there's nothing about the guns that was illegal.  So as

25  much as the government says to you you should think that he's a

1    violent guy because he had these guns, there's nothing that

2    supports that in the record.

3              THE COURT:  What about the secret operation?  I

4    forget if I asked you about this before, Ms. Harden.

5              MS. HARDEN:  You did not.  But -- but -- I can't even

6    say it enough because, obviously, Your Honor has not interacted

7    with Mr. Secor, and -- and he's not a kid in the sense that

8    he's an adult, but this is just chatter.  It is just chatter.

9    There's no secret operation that he was going to be involved

10   in.  There's no secret operation that the government uncovered.

11   It's -- it is the best way for the government to stretch the

12   facts and make you think -- or make the Court -- or request

13   that the Court think that Mr. Secor is somehow dangerous or

14   violent.

15        Even the conversations that he was having with his

16   friends -- first of all -- right? -- as we see here, he didn't

17   know anybody was going to be reading them, but he certainly

18   wasn't talking about, like, back once he's in California,

19   putting together some operation that they're going to now come

20   back to D.C. and do something else.  It's just a stretch of the

21   facts, Your Honor.  And Mr. Secor has never and is not now a

22   person who is violent.

23        Now, the government says -- and I -- and I just would

24   beg to different on this.  With respect to these guns, assuming

25   that they were legal, which the government doesn't have any

1  evidence that they were not --

2          THE COURT REPORTER:  I lost you there.  Can you

3  repeat.

4          MS. HARDEN:  Sorry.

5      The government says with respect to ghost guns -- with

6  the exception of ghost guns, that Mr. Secor could not have

7  traveled with them to D.C.  I stand before you with a case

8  where somebody did travel with a legal gun on a plane through

9  TSA to D.C.  That's just not true.

10      I mean, if -- if his plan was to take over in the way in

11 which the government wants you to insinuate, he could have

12 packed a legal gun.  All you've got to do is check it through

13 TSA, in whatever way TSA allows.  And so, certainly, that's

14 just not correct.  That was not his intent.

15      He came to a rally.  He came to a protest.  And he

16 attempted -- although he didn't succeed -- in participating in

17 civil disobedience.  He got himself caught up in a felony, and

18 prison time is not what's appropriate under the circumstances

19 here.

20          THE COURT:  Do you know anything about the $3,300 in

21 purchases from the military tactical gear retailer?

22          MS. HARDEN:  I do.  Listen, I think in California,

23 where you can purchase these things -- I mean, again, they're

24 not banned on the internet.  I find all kinds of things that

25 you can now buy on the internet, Your Honor; all kinds of

1   services and things that you can do.  But the reality is

2   they're not illegal, and I think both Mr. Secor and his --

3   well, Mr. Secor enjoys the ability to put together guns in a

4   legal way.  California, I don't think, has outlawed them in any

5   way that -- in terms of what Mr. Secor was doing, and so he

6   made the purchases.

7        Again, what I will say is that it's not conduct that

8   relates to January 6th.  That's the bottom line, is whatever he

9   was buying, whatever he was doing, does not tell you that he is

10  somehow going to be engaged in violent conduct with respect to

11  guns.  Guns are legal.  Shooting is legal.  Hunting is legal.

12  All kinds of things are legal in terms of possession of guns in

13  California, and that just doesn't relate to what happened on

14  January 6th.

15       With respect to the deleted evidence, Your Honor, all I

16  can tell you is that young people these days have social media.

17  Everybody in this courtroom, everybody in here has been 22, but

18  all of us didn't have IG, internet, or Facebook at the time

19  that we were 22.  So now those things are recorded in real

20  time, it would make sense that Mr. Secor would think, okay,

21  it's a big deal now.  TV is making clear that people are about

22  to get locked up.  So I have deleted my Twitter account.

23       You know what, Your Honor?  The guidelines have taken

24  that conduct into consideration.  That's where they put him in

25  terms of the guidelines, that obstruction.  The 2-point

1    enhancement is there.  So the Court does not have to do

2    anything further in terms of deciding whether or not that

3    conduct has been accounted for.

4        He shouldn't have done it.  He's gotten himself in this

5    situation where he's before the Court, but what's appropriate

6    under these set of circumstances, these facts that this Court

7    has before it, is that, largely, Mr. Secor was completely not

8    violent that day.

9        You know how you know he was intending to engage in

10   civil disobedience?  Because he had a flag.  His flag was his

11   expression of his free speech.  It was not to say we want to

12   take over the government.  He said whatever he said on Twitter.

13   But he was there to participate in an act of civil disobedience

14   that I'm sure he thought at worst would get him a fine, a

15   misdemeanor, or something of that sort.  He certainly didn't

16   know until I talked with him that this kind of stuff was felony

17   conduct, and certainly not federal felony conduct, because he

18   was 22.  And in that decision that he made, he made a mistake.

19       And as I said in my sentencing memo, Your Honor, he

20   regrets the day that he walked inside of that Capitol.

21       Your Honor, for all of the reasons that I've stated in

22   my sentencing memoranda -- the Court has probably 60 or 70

23   pages of information between memoranda, photographs, and

24   letters on his behalf.  Everybody has told you who Christian

25   Secor is.  You know the who, you certainly know the why, and

1    now I think the only question the Court has to answer is

2    whether he should go to prison.

3           And I would respectfully request this Court impose a

4    sentence of probation; that the Court not impose what is

5    requested by the government, not even by the probation office.

6    And with respect to the guidelines, I think the Court has made

7    the appropriate application, and I would ask the Court give the

8    sentence we've requested in our sentencing memoranda.

9           THE COURT:  Thank you, Ms. Harden.

10          MS. HARDEN:  Thank you.

11          THE COURT:  Mr. Secor, you have the right to make a

12   statement or present any information to mitigate the sentence.

13   Would you like to say anything you would like me to consider

14   before imposing sentence?

15          You can approach the podium, sir.

16          MS. HARDEN:  Your Honor, before Mr. Secor is heard on

17   that, can I say one more thing.

18          THE COURT:  You may.

19          MS. HARDEN:  I didn't -- I failed to mention that

20   he's been on High Intensity Supervision Program for now

21   18 months with zero -- with zero infractions.  And so I would

22   ask the Court to take that into consideration also.

23          THE COURT:  Thank you.

24          THE DEFENDANT:  I'd just like to make a slightly

25   miscellaneous comment about the -- secret operation, was it?

1     That was, like, a possible financial business idea.  I don't

2     know why my friend called it a secret operation, but that --

3     that's it.

4               THE COURT:  Okay.

5               MS. HARDEN:  Thank you, Your Honor.

6               THE COURT:  Sir, you can remain at the podium.

7          I've assessed the particular facts of this case in light

8     of the relevant 3553(a) factors, and I now want to provide

9     remarks for the record and for you, sir, about my

10    considerations in regards to the nature of the offense and your

11    history and characteristics.

12         On January 6th, 2021, you participated in a national

13    embarrassment.  Your actions on that day were very troubling.

14    You illegally entered the Capitol Building and walked through

15    the office suite of Speaker Pelosi.  Perhaps unbeknownst to

16    you, there were staffers cowering in offices throughout the

17    Capitol, terrified that rioters like you might force their way

18    into those rooms and attack them.  They were barricading

19    themselves in offices and frantically calling law enforcement

20    for help.  You are, in part, responsible for the trauma they

21    experienced on that day.

22         You then assisted a group inside the Capitol Building to

23    push against the east Rotunda doors which three Capitol Police

24    officers were guarding.  You helped that group overpower the

25    offices after the group had trapped them against the doors.

1    You then helped other people on the outside of the building

2    enter the Capitol.  I have carefully reviewed the video footage

3    of that incident.  I don't believe there's any evidence that

4    you personally injured or threatened to injure anyone; however,

5    you certainly participated in a very volatile situation, one

6    that could have led to serious injuries.  I'm also appalled

7    that you involved yourself in a situation that so clearly and

8    physically obstructed the efforts of law enforcement to protect

9    the Capitol Building from rioters.

10        Then you entered the Senate Chamber and -- and actually

11    ended -- entered the Senate Floor.  You made your way to the

12    Senate dais and sat in the seat which the Vice President had

13    occupied over 30 minutes earlier.  The sights we saw on

14    January 6th, 2021, the crimes you and others committed on that

15    day are things Americans never thought they'd see in the

16    Capitol Building, and we certainly never hope to see them

17    again.

18        Your decision to sit in the Vice President's chair at

19    the very time he was supposed to be certifying the election

20    showed a blatant disrespect for the office of the

21    Vice President and our system of government.  You pled guilty

22    to obstructing an official proceeding due to this conduct.

23    That means you intended to obstruct the certification process

24    occurring that day, a vital and solemn step in the peaceful

25    transfer of power from one President to the next.

1      Your actions, most clearly your decision to sit in the

2  Vice President's chair, actually and self-evidently obstructed

3  that proceeding.  Your statements following January 6th

4  underscore that you knew what you were doing that day.  You

5  tweeted at prominent commentators, who condemned the violence,

6  that they should be proud of what happened on January 6th.  And

7  you tweeted, "One day accomplished more for conservatism than

8  the last 30 years."

9      Apparently realizing these statements could be used

10  against you, you deleted your Twitter accounts and destroyed

11  your iPhone, as police could not uncover it when they searched

12  your home, and you began using a new Samsung phone.  You also

13  texted a friend about deleting your Facebook page, confirming

14  that you would delete it.

15      In short, I think your conduct on January 6th was

16  extremely serious.  Your actions were about as blatant and

17  obstructive as any I've seen from that day that do not involve

18  actual violence against law enforcement.

19      Having said all that, your broader record is much more

20  favorable for you.  I credit your lack of criminal history.

21  You don't even have a speeding ticket.  You were a 22-year-old

22  college student on January 6th.  You also have a strong

23  employment track record for someone your age, working both at

24  your father's vacation rental business and other hourly-wage

25  jobs since 2017.

1    The letters submitted on your behalf state that you are

2    hard working, willing to help others, devoted to your family,

3    kind, and generous.

4    I've also considered your attorney's arguments about

5    your relative immaturity at the time of the violence and the

6    science that -- about young men's mental impairment; and I also

7    agree with her that you deserve credit for not having any

8    issues while on high intensity supervision.

9    Frankly, I'm not really sure what to say about the --

10   the evidence of guns and nationalistic behavior.  I can

11   certainly understand the government's concern about someone who

12   is spending as much time and money buying guns as you

13   apparently were and being involved in an -- in an organization

14   that has some pretty ugly sides to it.  On the other hand, I

15   agree with Ms. Harden that it's not illegal to own guns and

16   that I -- I don't know much about the American -- America

17   First, but the fact that UCLA allows them to be an official

18   club somewhat mitigates what concerns I'd have.

19   I also -- I think the fact that you didn't bring any

20   guns or other weapons on January 6th also mitigates my concerns

21   about what you've done elsewhere.  I've -- your attorney has

22   talked about your remorse.  You've -- I've heard letters --

23   seen letters saying that you're remorseful.  Frankly, I'm not

24   sure that I've really seen that from you.

25   As we've discussed previously, there is a disagreement

1   about what sentencing enhancements should apply.  The

2   government argues that an 8-level enhancement applies because

3   you caused or threatened to cause physical injury to a person

4   or property damage in order to obstruct the administration of

5   justice.

6           Similarly, the government argues that a 3-level

7   enhancement is appropriate because the offense resulted in

8   substantial interference with the administration of justice, to

9   wit, certification of the electoral vote.  Ultimately, as I

10   said, I have an independent duty to determine the applicability

11   of these enhancements.  I think the guideline range calculated

12   by the probation office and the recommended sentence of the

13   government result in an overly harsh sentence here.  In

14   particular, I think, the 8-level enhancement under guideline

15   2J1.2(b)(1)(B) is too severe given that you yourself didn't

16   injure anyone, nor did you damage any property.  I think this

17   enhancement is primarily aimed at those seeking to obstruct

18   justice by witness intimidation or the like.  That did not

19   happen here.

20           Having said that, I cannot ignore the totality of the

21   events, including your involvement in pushing officers out of

22   the way who were blocking a door.  In short, I don't think the

23   guideline applies here for various reasons.  But even if I did,

24   I would vary down, at least in part, to compensate for what I

25   think is an overly lengthy sentence.

1        I do think the substantial interference, 3-level

2   enhancement, is relevant.  Even though I don't think the

3   administration of justice language actually applies to this

4   situation, I have no doubt the commission would have intended

5   for this to apply to substantial interference with an official

6   proceeding like a certification process, which is itself more

7   significant than almost any court proceeding.  And you and your

8   fellow rioters were responsible for obstruct- -- for

9   substantially interfering with the certification, causing a

10   multiple-hour delay, numerous law enforcement injuries, and the

11   expenditure of extensive resources.  So while I don't calculate

12   that enhancement as part of the guideline range, I do think it

13   is a relevant data point when considering an appropriate

14   sentence under 3553(a).

15        I've also considered the proposed sentencing

16   comparators submitted by the government.  Ultimately, I am --

17   had focused most on *United States v. Hale-Cusanelli*, 21-cr-37.

18   Like you, Mr. Hale-Cusanelli was convicted of an obstruction

19   of an official proceeding relating to his actions on

20   January 6th.  And, like you, he received a 2-level obstruction

21   of justice enhancement in his case due to his perjurious

22   testimony.  I think your conduct on January 6th was actually

23   more serious than his, especially your conduct on the Senate

24   Floor.

25        However, he had a history of hateful and racist remarks,

1    which I found motivated his actions on January 6th.  The

2    government has made similar arguments about you, but,

3    ultimately, I think the evidence is a lot less aggravated and

4    more tenuous in your case.  He also had a criminal record and

5    was older than you at the time.

6         Finally, and importantly, he did not take responsibility

7    for his actions before trial, unlike you.  In all, I think a

8    sentence below his -- and he received four years of

9    incarceration -- but in the similar neighborhood is appropriate

10   here.

11        Ultimately, I believe that a sentence of 42 months is

12   appropriate here.  I believe both the seriousness of the

13   event -- you obstructed the certification of an official

14   proceeding -- and your particular role in it -- specifically

15   your entry into the Speaker's suite, your assistance in pushing

16   open doors being guarded by police officers, and your flagrant

17   conduct on the Senate Floor -- require a significant upward

18   variance from what I believe is the appropriate --

19   appropriately calculated guideline range here.

20        However, if the government is correct about the

21   appropriate guideline range, I would still issue the same

22   sentence here because I think that 8-point enhancement is

23   overly punitive given the facts of this case.  In short,

24   whether this is viewed as an upward variance from the guideline

25   range I calculated or a downward variance from the range the

1    probation office calculated, I would still issue the same

2    sentence, recognizing that the guidelines are voluntary and,

3    frankly, are not very well suited to this particular situation.

4        I believe the sentence is sufficient but not greater

5    than necessary to comply with the purpose of sentencing.

6        The end result is that you're facing a significant

7    period of incarceration for your conduct.  I have no doubt this

8    time has been the darkest period of your life and these next

9    few years look bleak for you now.  You are, however, still a

10   young man and will be a young man when you are released.

11   You're also a very intelligent man.  I think that's clear from

12   all of the information presented on your behalf.  And you have

13   a family and support system that, frankly, very few other

14   criminal defendants could imagine.

15       I encourage you not to let January 6th or the sentence

16   define you.  Many people have made mistakes in their early 20s

17   and go on to have productive, successful lives.  You can be one

18   of those people if you set your mind to it.

19       I will now impose the sentence.  It is the judgment of

20   the Court that you, Christian Alexander Secor, are hereby

21   sentenced to serve a term of 42 months' incarceration on

22   Count 1, as well as a $100 special assessment.  You will also

23   serve a 3-year term of supervised release.

24       Within 72 hours of release from custody, you shall

25   report in person to the probation office in the district to

1      which you are released.

2            While on supervision, you must abide by the following

3      mandatory conditions:  You must not commit another federal,

4      state, or local offense.  You must not possess or use any

5      controlled substance.  You must submit to one drug test within

6      14 days of the commencement of supervision and two additional

7      periodic drug tests.  You must cooperate in the collection of

8      DNA.  You must abide by the recommended standard conditions of

9      release found in guideline 5D1.3(c).

10           You must also comply with the following special

11     conditions:  You must pay the financial penalty in accordance

12     with the schedule of payments sheet of the judgment.  You must

13     also notify the Court of any changes in the economic

14     circumstances that might affect your ability to pay this

15     financial penalty.

16           I've assessed your ability to pay, and payment of

17     the total criminal monetary penalties is due as follows:

18     Payment in equal monthly installments of $60 a month over a

19     period of 35 months to commence once you're released on

20     supervised release.  You must provide the probation officer

21     access to any requested financial information and authorize

22     the release of any financial information.  The probation office

23     may share financial information with the United States

24     Attorney's Office.  You must not incur new credit charges or

25     open additional lines of credit without the approval of the

1    probation office.

2          The Court finds that you do not have the ability to pay

3    a fine and, therefore, waives imposition of a fine in this

4    case.  You're -- I also waive the -- I waive interest on any of

5    the monetary payments required here.

6          You are ordered to make restitution to the Architect of

7    the Capitol in the amount of $2,000.  Restitution payments

8    shall be made to the Clerk of the Court for the U.S. District

9    Court for the District of Columbia for disbursement to the

10   Architect of the Capitol at the Office of the Chief Financial

11   Officer.

12         Payment of all financial obligations described herein

13   are specific requirements of your obligation -- of your

14   probation.

15         The $100 special assessment is immediately payable to

16   the Clerk of the Court for the U.S. District Court for the

17   District of Columbia.

18         Within 30 days of any change of address, you shall

19   notify the Clerk of the Court of the change until such time as

20   the financial obligation is paid in full.  And I should have

21   said it's -- payment of all these financial obligations is a

22   specific requirement of your supervised release.

23         The probation office shall release the presentence

24   investigation report to all appropriate agencies, which include

25   the United States Probation Office in the approved district of

1    residence in order to execute the sentence of the Court.

2    Treatment agencies shall return the presentence report to the

3    probation office upon the defendant's completion or termination

4    from treatment.

5          Pursuant to 18 U.S.C. 3742, you have the right to appeal

6    the sentence imposed by this Court if the period of

7    imprisonment is longer than the statutory maximum.  If you

8    choose to appeal, you must file any appeal within 14 days after

9    the Court enters judgment.

10          And as defined in 28 U.S.C. 2255, you also have the

11    right to challenge the conviction entered or sentence imposed

12    if new and currently unavailable information becomes available

13    to you or in a claim that you received ineffective assistance

14    of counsel in entering a plea of guilty to the offense of

15    conviction or in connection with sentencing.  If you're unable

16    to afford the cost of an appeal, you may request permission

17    from the Court to file an appeal without cost to you.

18          Pursuant to *United States v. Hunter*, 809 F.3d 677, from

19    the D.C. Circuit in 2016, are there any objections to the

20    sentence imposed not already noted?

21          Ms. Paschall?

22          MS. PASCHALL:  No, Your Honor.

23          THE COURT:  Ms. Harden?

24          MS. HARDEN:  Already noted, Your Honor.

25          THE COURT:  All right.

1          MS. HARDEN:  I do have one request, but I'm not sure

2     it's appropriate to ask it now or ask it later.

3          THE COURT:  Try it.

4          MS. HARDEN:  So, Your Honor, I would -- since the

5     Court has imposed a prison sentence, that Mr. Secor be given an

6     opportunity to surrender himself in the next 60 days.

7          I'm, obviously, going to find a facility that I think is

8     appropriate based on his age, based on his prior experience,

9     and I would ask the Court not step him back to the D.C. jail

10    based on every -- the Court knows about the D.C. jail already,

11    but also what came out with respect to January 6th folks.

12         THE COURT:  Ms. Paschall, do you have an objection to

13    self-surrender.

14         MS. PASCHALL:  We don't take a position, Your Honor.

15         THE COURT:  All right.  I will allow the defendant to

16    self-surrender.  I do that, in large part, because the

17    defendant has been in compliance with his pretrial supervision.

18         MS. HARDEN:  Thank you, Your Honor.  May we be

19    seated?

20         THE COURT:  Ms. Paschall, do you have a motion?

21         MS. PASCHALL:  Yes.  At this time, Your Honor, the

22    government would move to dismiss the remaining counts in the

23    second -- first superseding indictment.

24         THE COURT:  All right.  Ms. Harden, do you have any

25    objection?

1              MS. HARDEN:  No.  No.  I would ask they be dismissed

2      with prejudice.

3              THE COURT:  I'm granting the government's motion.

4          All right.  Good luck to you, sir.

5          This concludes the sentence in this case.

6              (Proceedings were concluded at 3:25 p.m.)

1          <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9               Dated this 19th day of October, 2022.

10

11               /s/ Nancy J. Meyer
                 Nancy J. Meyer
12               Official Court Reporter
                 Registered Diplomate Reporter
13               Certified Realtime Reporter
                 333 Constitution Avenue Northwest
14               Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25